Good morning and may it please the Court, Mark Fleming with my partner Lauren Fletcher on behalf of MEDTRONIC. The patented method in this case requires a catheter to be used in a very specific way, a way that had to be added to the patent to get it to issue in the first place. There is no proof that MEDTRONIC's EBU was used in that specific way. There is no proof that MEDTRONIC intended or encouraged its use in that way. There are admitted non-infringing uses that are substantial. At the outset, with respect to instances of direct infringement, which are required to sustain the verdict in this case, there is a very basic failure of proof at the outset, which is that neither of the witnesses who claimed to have used the EBU in an infringing way could testify that they used it during the life of the patent. The patent issued in 2000, Dr. Voda said he had used an EBU 10 or 12 times during his career. When the last time was that he used it, Dr. Cronus similarly could not testify as to when he used the EBU. The most that you see in the appellee's advocacy on page 24 of the red brief and on page 11 of the reply in support of cross-appeal is that Dr. Cronus performed angioplasties after 2000. That, of course, does not permit an inference that he used one of the accused products in any of those operations. That by itself suffices to reverse because of a failure of proof of specific instances of direct infringement. Now, of course, there's more. They were also not able to testify that they practiced the specific claim requirement of contacting the aortic wall for 1.5 centimeters or more opposite the ostium. Dr. Cronus admits on page 7007 that he couldn't recall seeing the length of the EBU catheter on the opposite wall in any of his procedures, and Dr. Voda likewise admitted he couldn't remember any contact. He assumed that contact happened, but that at most is consistent with contact at an apex, which, as the EBU's designer, Mr. Horrigan, testified was the purpose and intent of the device. There's nothing suggesting that it wasn't also contact higher up on the wall, which Dr. Voda conceded a so-called Judkin-style engagement would also not infringe. So neither of them... You're making a good argument on the fact. Tell us where there is no substantial evidence to support the jury verdict. Certainly, Judge Newman. The first point is there is no evidence whatsoever of a use after the patent itself issued. That was the first point I made. And the second was no evidence of a specific instance of direct infringement. The argument that the appellee has in response turns in large measure on illustrations in certain Medtronic documents. But as this court has ruled in cases like ACCO and Fujitsu and Mirror Worlds, the only situations in which one can infer from illustrations in a manufacturer's document that a specific instance of direct infringement happened is, at least in the first place, when we're talking about documents that were actually given to the third party that was in a position to perform the claimed method. And here, this case, I would submit, is much like ACCO, where the patentee tried to rely on a manufacturer's hang card, which instructed the infringing method, but this court held that that was not enough because there was no evidence that the hang card was ever actually given to the end users who might have performed the claimed method. Likewise here, none of the documents that Dr. Voda relies on were proven to have been given to any doctor who then went to perform an angioplasty using an EDU in the manner corresponding to the claims. The only documents that are sent out with a Medtronic catheter are the instructions for use, which are generic to all Medtronic catheters. They say nothing about the contralateral wall. They say nothing about contact length or location. And, in fact, the image that Dr. Voda reprints twice in his red brief expressly says on it, for Medtronic personnel only, do not confuse... So don't those documents speak to the enhanced support of the EDU? They certainly do speak about extra backup or support, and, of course, that does not infringe. Dr. Voda conceded on the stand that the AMPLATS provided... There's an EDU to the cortis catheter. It seems to me that Medtronic is making the argument or assertion that there's greater shafting contact with the aorta, and this goes to the very heart of the invention, doesn't it? Well, first of all, Judge Reyna, I don't know specifically which document you're referring to, but that one, I believe, is one that says on it that it's not to be shared outside of Medtronic. And there is no evidence that anybody actually saw that. So for purposes of inferring a specific instance of direct infringement, I think that's just like ACCO, where there was a document that supposedly instructed the infringing use. Even if I agree with you, which I don't, that that instructs the infringing use, there's no suggestion that you could infer from that that a doctor actually went out and performed the infringing use as a result of it. Now certainly greater shaft contact with the aorta can be also construed as a contact with the aortic arch itself, not contact opposite the ostium, which is a requirement. Dr. Voda does not dispute this. In fact, the very reason that a Judkins, which also has shaft contact with the aorta, does not infringe is because it's not opposite the ostium. So the most we can say, Judge Reyna, I believe, is that Medtronic printed some materials, none of which was proven to have been shown to a doctor. Certainly none is drawn to scale, so they do not give a fair depiction of what happens during a live angioplasty. Well, I'm looking at a picture, I think it's at A13069, and it's a comparison between the EBU and the cortis XBC curve, and it seems to me that those pictures clearly illustrate the catheter leaning against the aorta wall opposite of the ostium. Well, if one, first of all, Judge Reyna, I'd point out on the side of this it says, for use by Medtronic personnel only, do not copy or distribute. So once again, there is no evidence whatsoever that this ever left the walls of Medtronic and could be used to infer that there was an actual use of the product in the infringing way. Also, when one looks at it, the contact is higher up on the wall than where the actual coronary ostium is. Now whether or not it was higher or lower than the XB, as depicted in this particular image, does not show that Medtronic was inducing anybody to use the EBU in a way that is specifically claimed in the very narrow claim of the patent. Notably, Dr. Voda conceded on the stand that there are many factors that affect where and for how long a catheter is going to contact the aortic wall. It depends on the age of the patient, it depends on the size of the catheter that's used, it And Dr. Uretsky testified that it also depends on physician technique, and all of these points will make a difference as to where the contact actually happened. But just looking at the EBU again, wasn't it designed, isn't it specifically designed to have at least or more 1.5 centimeters contact with the aorta wall? Not in the least, Judge Raynor, not at all. In fact, the depiction of the EBU as it is supposed to sit in the aorta is the engineering diagram that we reprint on page 11 of our blue brief, and Dr. Voda conceded on the stand that that depiction, which shows an apex of contact with the aortic wall, does not infringe. He makes that concession, I'll give your Honor the site specifically. The concession is on page 6893 of the joint appendix. He says that that engineering diagram, which Dr. Mr. Horrigan, the designer, specifically said depicts the intent of the patent, provides contact at an apex. The patent being the BRIN patent, the Medtronic patent, not the Voda patent. The BRIN patent itself says very clearly in the claims, it is the claims of the BRIN patent that actually cover the EBU catheter, that the contact with the aortic wall is an apex. It's number 15 as depicted in the BRIN patent. So most assertively, no, Judge Raynor, it was not designed to have more than 1.5 centimeters of contact. That is why Dr. Voda was not able to find a single doctor who could come in and say, I saw some of these materials, I chose not the non-infringing depictions, which there conceitedly are in the materials that Dr. Voda relies on, but instead chose an infringing route, even though nobody at Medtronic ever told me to do that, and then I went and performed the method in an infringing way. There is no testimony like that whatsoever. The only thing they have is Dr. Cronus' testimony as to feel, in which he did a demonstration in an explanted heart that had been taken from a dead body. It was placed in a lukewarm water bath, and he put a catheter into it and said, this feels like a live angioplasty, but of course he could not say that he could measure 1.5 centimeters of contact merely by feel. He certainly did not say that an infringing contact would feel any differently from a non-infringing contact, and that makes sense, because doctors do not care about length or location of contact on the aortic wall. They're focused on the distal tip, and getting it into the ostium, getting the surgical equipment through to unblock the artery. That is the point of the operation. The only reason to focus on contact with the contralateral wall is if you're involved with a patent case where those limitations happen to matter, and there is no suggestion that Dr. Cronus, during his years of surgical practice, would ever have paid attention to that. It seems to me you're kind of dancing around the central issue for the use of these catheters. I may be wrong, but there's so much pressure coming within the heart itself that it pushes out the aorta, excuse me, it pushes out the catheter once it's inserted into the ostium. So the whole point of these catheters, and there's a bunch of them, different shapes and everything, is to provide some sort of support against that pressure. Yes, that's absolutely right, Judge Rayner. We don't deny that. There certainly is support, but the point is not all support, not all extra backup is infringing. It has to be specifically support by 1.5 centimeters or more opposite the ostium. Dr. Voda admits on page 6864 that he used the prior art AMPLATS catheter, quote, for extra backup support in difficult cases. The AMPLATS provides extra backup, but he also conceded on 6859 and 6860 that the AMPLATS technique does not infringe. It is possible to get support, it is possible to get extra backup without infringing Dr. Voda's specific patent. He needed to include the 1.5 centimeter limitation in order to get over the prior art, precisely because this is a crowded field and there are a lot of patents out there. What about the experiment on the heart taken from the cadaver heart? I mean, he cut away and was able to observe the 1.5 contact, correct? Well, what he did was he purported to analogize the heart sitting in the water bath to the feel of an actual angioplasty. Again, never saying that he could compare an infringing use to a non-infringing use and tell them apart by feel. But then what he did was he removed the catheter, he took the heart out of the water bath, put it on a table, dried it off, cut it open, as your honor says, which makes it collapse like a wet noodle, then he reintroduced the catheter and purported to measure it. Now, he never said that in that second phase, that was in any way representative of what you would see in a live angioplasty. Was he cross-examined? He certainly was cross-examined, your honor. And what was the nature of the cross-examination? Well, he was cross-examined on that basis, but that doesn't deprive us of a Daubert objection that it should have been inserted in. What happens if the jury disagreed with the cross-examination? Well, the jury is confined by substantial evidence. Obviously, we have one argument, which is that that should never have come in in the first place, because it was not scientific. It was as speculative as it could be, and pure ipsedixib on the heart of the animal. Did you have any evidence that the EBU does not have 1.5 contact? Dr. Uretsky, our expert, looked at an actual fluoroscopic image of Dr. Cronus's cadaver heart when the EBU was actually inserted before it was cut open, and he estimated it as being less than 1.5 centimeters. That's bitter evidence. I mean, you're saying don't accept the cadaver heart experiment as evidence, but yet the evidence that you cite is that what you presented is that same experiment. Once the district judge let the evidence in, we did the best we could with it. Yes, Your Honor, that was a matter of trial strategy. We couldn't say nothing about it, but that does not mean that we somehow forfeited the objection. Did you present any evidence other than that? Did we present evidence that it doesn't contact for 1.5 centimeters? Yes. Well, certainly, the engineering diagram that I referenced earlier on page 10329 of the Joint Appendix, reprinted on page 11 of our blue brief, depicts the EBU as it is designed to function within the aorta. It's taken at a time when it's sitting in a glass aorta filled with water at body temperature, not lukewarm water at room temperature like Dr. Cronus had used, and that shows a depiction of an apex, which Dr. Voda at 6893 conceded does not infringe. We provided that evidence, but most importantly, Judge Reyna, it's not the defendant's burden to show non-infringement. In this type of situation, where you have no witness standing up and saying, I used this in a way that performed the infringing method, and all that we have is an effort by an expert to tell by feel in a circumstance that no one could say is comparable to a live angioplasty when you have warm blood pumping through, expanding the aorta, softening the catheter. He did not testify that that, which is when he took the measurement, was in any way representative of what one would see in a live angioplasty. We would submit that that is not enough to find any actual instance of direct infringement. If it was so easy, then the court's comments in E-pass repeated again in mirror worlds, I would submit are correct, which is that they could have found one doctor to come in and say, I did this, but during the life of the patent. What on your theory would they have had to have produced in the form of evidence in order to prove infringement? They could have done exactly what they did in Cordis, which is they brought in fluoroscopic images of the accused products being used in live angioplasties. Both Dr. Voda and Dr. Cronus admitted that those images were available to them. Dr. Voda had them in his hospital, but he failed to preserve them. Dr. Cronus had them in his cath lab, but he simply didn't bring them to trial. They preferred to rely on this speculative, non-scientific demonstration, which no doubt was very effective in front of the jury, but it should not have been admitted. And it invited the jury to take speculative leads that are not supported by substantial evidence. I would say we're... The case really turns on the Daubert issue, right? Not necessarily, even if you all... Strongly, strongly. Well, Judge Kleppinger, I think... Substantial evidence and what the juror... How much faith they put in the doctor and the witness and what he was saying. That is part of it, but we have additional arguments on inducement and contributory infringement. Even if the court concludes that there was sufficient evidence to find an act of direct infringement, that doesn't get them all the way there. They also have to find that Medtronic acted with specific intent to induce or contribute to those acts of direct infringement. And I don't want to go too far over my time, but the arguments there, I think, are equally strong, if not stronger. The district court's language on inducement is, I think, quite telling. The district court relies on what it perceives to be evidence of promotion of the EBU for contralateral support. Once again, contralateral support does not infringe. The Amplax has contralateral support. The Judkins gives contralateral support. What you need is support within the claimed location for the claimed length of 1.5 centimeters or more. There is no suggestion that Medtronic meant to induce that from anybody, and certainly no intent that Medtronic... No evidence that Medtronic intended to do that. Specifically, Medtronic knew that the EBU was usable in many ways that do not infringe. Its documents, many of the ones that VOTA relies on, including 10298, specifically say that the curve permits Judkins and Amplax-style engagement, which do not infringe. Medtronic was asked to make its curve more like the VOTA. It refused to do so. That's on 12-227, the memo memorializing that recommendation. Also, unlike Cordis, which blatantly copied VOTA's curve, Medtronic developed its own curve separately and got its own patent over the VOTA 625 as prior art, which at the very least gave them a reasonable basis for believing, as they did and still do, that their EBU is patentably distinct from the VOTA patent. You got that patent on the basis that there was more of this lateral support than with the Cordis device, right? We got the patent on the basis that it had an apex of contact. That's what the claims talk about, not 1.5 centimeters of contact. But that it had greater support against the aorta wall. It provides more backup support, not in the sense of more length of contact with the wall, because the claims talk about an apex of support, which is what's depicted on 10329. Mr. Horrigan, the designer...  Cordis was adjudicated to infringe. There's no dispute about that. Because it provided the... That's a necessary feature of the judgment. I mean, Cordis didn't appeal that to this court. So if the EBU device receives a patent because it provides greater support than the Cordis device, isn't that evidence for the jury to hear that the EBU device infringes because it exceeds or meets a 1.5 limitation? No, Judge Arena. You can have support and greater levels of support based on factors in addition to the length of contact with the contralateral wall. You can have support based on the materials that are used to make the catheter. And in this case, what we did is we created a catheter with a smooth curve. It doesn't have the bends and the angles that the Voda catheter has. And it is designed, just like it's depicted on page 11 of our brief, to touch at a point. And that is how we designed to do it. And we get extra backup and support that way. If that was not the case, then it was incumbent upon Voda to prove specific instances where that happened, and they failed to do it. I haven't spoken much about contributory, but... We'll save you rebuttal time as well. Thank you, Your Honor. Okay. Mr. Stockwell. May it please the Court. Mitch Stockwell for Dr. Voda with my partner, Clay Holloway. I want to just march through and respond to some of the points, but first I want to start off with exactly what the doctors testified about, because I don't think that's very clear from Medtronic's brief. And I'm referring to A69-77-80, which is Dr. Cronus's experience, A67-50-51, and A67-74-79, which is Dr. Voda's experience. And what the doctors testified to was not simply feel, in the sense of a feeling, and it was not simply feel in the sense of a tactile feel. What they testified to was that there would be a diagnostic procedure. You'd go in. They would just scan your heart, so there would be an anatomy selection. They would know what the landscape is. They would then pick amongst different shaped catheters. In the second procedure, which was the guiding catheter procedure, where they actually would fix the problem, they would advance the catheter up over the aorta with the wire in it. That straightened the catheter out so they could manipulate it. They would remove the wire. The shape of the catheter would then come back because of memory. They would insert the tip into the ostium, and they would butt the long length up against the wall. Now, while they were doing this, they were observing the angiogram to make sure the tip went into the ostium, and in Dr. Voda's case, he swung the camera over to look at that line along the wall. Now, you can't tell from the angiogram exactly whether the line is against the wall because it's a tube, and it's a two-dimensional image. What Dr. Voda testified is the reason feel tells him he's getting a more than 1.5 centimeter support, and this is in the record. He put the extra dye in. You can feel the end of the catheter, the pressure pushing back here, and you can feel it tighten, and he's watching the angiogram and seeing that long length up against the wall. Dr. Kronos. He testifies as to the 1.25. He testifies that what he testified to is, I can't tell you the specific measurement, but I know the dimensions of the aorta. I know the aortic root there is about 3.5 centimeters, and relative dimensions tells me this is 3.2 to 3.5 centimeters up against the wall. Dr. Kronos explained the same thing, and then he took the jury through his cadaver demonstration, which is circumstantial evidence of the 1.25. Excuse me, Your Honor. I would say that's direct. These physicians testified they used the EBU in a patient, achieved the engagement of 1.5  So, that's direct evidence of the 1.25. Did they actually say they achieved 1.25? Yes, Your Honor. That is Dr. Voda's testimony, and if you look in the record, he says at age 6750-51, he objected the additional contrast to observe the EBU fixed segment was from 3 to 3.2 centimeters. And Dr. Kronos also walked through with the jury how, giving them the cadaver study, how you could visualize this when you're inserting the catheter in and you're feeling the end. So, that was the testimony, that's the feeling testimony that Medtronic criticizes, and it's not just based on training, it's based on the visual image of putting the working tip in and the feel at the end. Now, counsel says, well, you must disregard all that testimony because of a timing issue. At age 7005-06, Dr. Kronos testified he had used several hundred EBUs up until 2008, patent issued in 2000. I don't think there's a timing issue. Additionally, at age 6380, Mr. Horrigan, Medtronic's witness, testified the EBU shape never changed from the time of its introduction in the United States. Even assuming their point about the timing, there's certainly circumstantial evidence that if the physicians had done it before the patent issued and the shape never changed, that it was going to have the same performance after the patent issued. So, even assuming, and we get that inference because of the JMOL standard. Now, with respect to the document... This testimony that you're just relying on from Dr. Voda is not the testimony that was struck, right? I'm sorry? Some of Dr. Voda's testimony was struck, was it not, as a result of the Daubert ruling? Your Honor, yes. But help me out. The evidence you're just talking about wasn't the evidence that was struck. No, the evidence I was talking about was not. What was struck was Dr. Voda, during the time of the Cordis case in 2005, when he used the EBUs, he also did a cadaver demonstration with the EBUs and a heart, but by the time the Medtronic case was tried in 2011, he could not remember the details of that demonstration. And the trial court said, well, since you can't remember the details of that demonstration, I'm not going to let you testify about it. So, that was the portion of his testimony that was struck. So, with respect to documents, I heard counsel say, well, there were never any documents, including the A13069 document that Judge Reyna asked about, that were shown to physicians. In the record, at A6420, this is a cross-examination of Mr. Horrigan, where they're talking about the A13069 document. This paragraph, and this is in the record, is a transcript of the voicemail sending that video clip with that picture that is in the briefs. It says, also, I will be sending via email a video clip of the XB engaged in a glass arch versus the EBU. You can use these clips to illustrate to your customers the contralateral support mentioned earlier. Correct? Answer? Right. The next page, he goes on to say, of course the sales reps used those materials in trying to sell to customers. So, the notion that that document was not presented to customers is incorrect. However, the engineering diagram that counsel says, well, Dr. Voda said this doesn't infringe, that is A6577. A6577 was not a document that went to customers. And that is, sorry, that's A10329 is the engineering diagram. The testimony that that diagram did not go to the customers was Mr. Horrigan testified at A6577. This document was only to test shape retention. When you put the catheter in a glass arch, you put warm water in there, does the warm water cause the catheter to lose its shape? It was not designed to show to physicians what configuration the catheter would take. Even so, counsel's suggestion that Dr. Voda said that, that configuration did not infringe is simply wrong. If you check counsel's site, A6891, Voda testified it was borderline. So, I think the notion that there's no evidence here is incorrect. I think with respect to the testimony concerning necessary infringement, we elaborated in our briefs the details of how this design was designed to engage far more than 1.5 centimeters. That came directly from comparing the Brin patent and Mr. Horrigan's testimony to the master shape of the EBU that Mr. Horrigan said, this is how all the shapes line up. We color-coded that and established from Mr. Horrigan's testimony that between 10 and 12 centimeters of the EBU was designed to go up against the contralateral wall. Now, I heard counsel say, well, but the patent is only claiming this apex notion. Incorrect. If you look at the claim at A10288, the claim talks about the, quote, first arcuate portion disposed along the contralateral wall. That first arcuate portion was shown to be the orange portion in our brief at the figure that was approximately 2 centimeters long. So, that was the testimony from Mr. Horrigan. Furthermore, we had testimony from Dr. Voda, correlating the design of the EBU to his design and showing why that design would necessarily result in infringement. Now, I want to pause here just a moment. The Vitamix case and the other cases on necessary infringement make clear that we had to show that the certain circumstances occurred were given that radial uses did not infringe, that the evidence showed when you used it in those circumstances, there would be infringement. And we did that. We showed that this catheter was designed for femoral use. And we showed that when it was used in femoral conditions, you would get the 1.5 centimeters of engagement. And that was Dr. Voda's testimony and Dr. Kronos' testimony. A6991 for Kronos, referencing A10547. Finally, we also had Dr. Kronos correlate the brochures that referred to the tertiary curve that was bracing against the wall and if you look at Dr. Kronos' testimony at A6958-65, he showed the jury that the doctors got not only the brochures, but they also got the catheters. And he pointed to the brochure that said the broad tertiary curve was braced against the contralateral wall and he showed on the catheter that was the segment that was more than 1.5 centimeters. And finally, we also showed, by reference to the diagram that counsel was referring to, that the cortis XBC catheter sat higher up opposite the wall from the ostium versus the accused EBU, which sat lower down and was more directly opposite. Indeed, Mr. Horgan testified that his apex would have to be directly across from the ostium. So, all of this necessarily showed infringement. We met our record there. I do want to refer a little bit to the Daubert issue in this case. The cadaver demonstration here was as much about showing the jury why trained physicians could, using the visualization that they did have of this three-dimensional aorta plus the feel of the catheter, it was as much about helping them understand why trained physicians could understand that this catheter was achieving 1.5 centimeters or greater engagement as to prove a specific measurement. But the real key here is, counsel said, if we had showed what we showed in cortis, they would not have a complaint. We did. The only thing Dr. Voda did not have, he had his recollection of injecting the dye and seeing more than a centimeter and a half to three to 3.2 centimeter engagement for EBUs. He didn't have a picture. That was the only thing that was different from this case and the cortis case. Moreover, in the cortis case, they had complained that we lacked a specific measurement, which is why we did the cadaver demonstration so we could show a specific measurement. I do want to address the cross appeal that we have. The cross appeal in this case really provides the court the first opportunity to address the jury's role when the jury finds facts related to Seagate's objective prong versus the trial court's role. Under Bard, you have said the trial court is the ultimate arbiter on that issue, but Bard also recognized trial courts would submit that issue to the jury, and indeed, to my knowledge, trial courts have continued to do so after Bard. If the trial court chooses to do so, this court's other authority, Juergens, the kinetic concept case, says the trial court must give deference to the jury's factual findings and see if there's substantial evidence underlying them. Here, the jury determined that Medtronic's defense was objectively unreasonable. The trial court gave no deference to those determinations, and instead, simply said, well, Medtronic put on defenses of contributory and inducement of infringement. Now, in the first instance, those defenses turn on issues of knowledge and intent that appear to fall more within the subjective prong than the objective prong. But even assuming they fall under the objective prong, the jury's determination under the Seagate instruction that Medtronic's denial of contributory infringement, Medtronic's denial of inducement was objectively unreasonable, should have been respected by the trial court. It was not. That leaves only the issue of validity, and here, I think the trial court misunderstood this court's standard. The character of the defense that the infringer has to present is not one that just has to pass the frivolous standard, the low threshold of frivolous. Instead, the defense must be one in which Medtronic has some substantial chance of success. And I would say, in the validity context, it's one where Medtronic must have an objectively high likelihood of success, given a clear and convincing standard. And in Safeco, the Supreme Court looked to a key guidepost for determining that issue, and it was prior decisions and prior authority. If there were prior decisions and prior authority, that was a good ground of concluding there was no objectively reasonable ground for proceeding. We have that here. The art on which Medtronic relied for its validity defense was art that had been the jury in the court's case, or this court in the court's appeal. So, we have a situation where the judge said, well, Medtronic put up some defenses on validity. When you actually look at the defenses, they were ones that had been rejected. Medtronic provided no different bases for that. Instead, took them into re-examination, and in re-examination, failed four times to convince the Patent Office under a lower standard of preponderant evidence that the patent was invalid. So, I don't think the validity ground can suffice to overcome the jury's determination that Medtronic objectively did not meet Seagate's first prompt. That only left one other ground for the trial court, and it was the fact that Medtronic  The patent, the own This was only raised by Medtronic as a defense to the subjective prong on Seagate, and Medtronic does not dispute on this appeal, as far as I understand it. That provides a good defense on objective, particularly given the advanced cardiology case versus Medtronic that finds having your own patent is no defense to willfulness. So, just as a matter of law, we think the trial court erred. This is a Are you arguing that willfulness, the question of willfulness should be limited only by the record that's developed at trial? Yes and no, Your Honor. In this sense, the jury has a certain portion of the record. The jury saw the infringement case, saw the whole infringement case. That portion of the record, the trial court in deciding the ultimate issue of infringement, the trial court has to respect that. There will be portions, such as in the cohesive case, of the record the jury does not see, such as claim construction battles over a key claim construction term that only the trial judge sees. Bard is really getting to that notion that, look, part of the entire record of proceedings, the jury may not see, but the trial court will see. Notably, in this case, there is no claim construction issue that Medtronic says was dispositive. So there was no legal issue outside the jury's purview that was purely known to the trial judge. The only thing that Medtronic said is, well, we had infringement defenses, which were squarely put to the jury. We had validity defenses as to which summary judgment of no anticipation was granted. The validity defenses either turned on art already considered by this court or validity defenses related to new art that they had come up with that, by stipulation, they said if it was sufficiently similar to what was put in the reexamination, we won't try that case. But they had a patent also on the device. That's correct, Your Honor, but I would say this court's authority makes clear, and there are two cases we cited in the brief, that that may relate to the intent prong, but it does not objectively absolve you of infringement, especially here, where we relied on that patent to show more than the 1.5 centimeters of engagement. So it's not like the patent went to some feature that they said, oh, well, this is why we don't really do it. In fact, their testimony was, including of Uresky, that they had no opinion as to infringement. They said Dr. Uresky gave an opinion of non-infringement. In fact, Dr. Uresky only said, I have no opinion at A7426. He didn't have an independent opinion. The only opinion he had came from the cadaver study. So just like Mr. Horrigan testified that he did not take the time to measure this, Uresky didn't take the time to measure this other than through his cadaver study. Thank you. Thank you, Mr. Stockwell. Mr. Fleming, I hear from you on the cross-appeal as well. Thank you, Your Honor. Briefly on those points. First of all, I'd like to respond to the first point Mr. Stockwell made regarding Dr. Cronus' timing. Mr. Stockwell represented to the court that on pages 7005 and 7006, Dr. Cronus says that he used the EDU after 2000, beginning on sentence 7005. Question, you began your clinical fellowship in June or July of  1991. I understand. So you started doing procedures here in 1993. Procedures. Middle of 1993, okay. And during those procedures that you did in the early 90s and here in the United States, you were not able to see the opposite wall of the aorta in a typical procedure because there wasn't enough contrast. Answer, correct. Question, the same was true in the mid-1990s. You might be able to see a shadow, but you couldn't define the aortic wall because there wasn't enough contrast. Answer, yes. And you don't recall the EDU cases that you did 15 to 20 years ago. Specific cases, no. And you don't recall the last time that you used an EDU. Answer, I don't. Question, I think you said the number of times that you would use the EDU was either the tens or the hundreds. You just don't remember. Answer, I think probably a couple of hundred. If you think about it, if I was doing, when I was doing a lot of angioplasties, I was doing two or three hundred patients, then it would have gone down. So if I was doing angioplasty for 15 years, I would say I probably used extra backup for some form of 30%, 40% of the patients. So clearly it's several hundred patients. No testimony about the accused product, the Medtronic EDU. He never said because he could not remember the last time he used an EDU. That's the first point. The second is... So what's the point? Are you trying to say that there's no evidence in the record that the EDU was ever used? No evidence that it was used to practice the specific Is it that the EDU has never been used? No, of course not. It has not been proven to have been used to practice the very specific claims of this patent. And that is what was required to be proven. Proving mere use of the EDU does not infringe. That is conceded. It can be used in the radial method. It can be used in a Judkins engagement. It can be used in an AMPLATS engagement. None of those infringe. In order to prove infringement, they would have had to prove during the life of claim limitations. And I was responding to Mr. Stockwell's contention that Dr. Cronus had said he used... This is a basic predicate. He used the EDU for a femoral approach after 2000. He did not say that. Moving to the point about Dr. Voda's testimony, there was a citation to 6751 about seeing, and I believe Mr. Stockwell's words were, seeing a long length against the wall. In actuality, what he talked about was seeing a segment leaning against the wall. And this is on 6751 at line 5. He's talking about what he perceives to be a segment of the EDU that was fixed because it is because, quote, it is leaning against the wall of the aorta. Now, of course, something can lean against something else without touching it over its entire length. Dr. Voda made the leap, speculative, not supported, and Mr. Horrigan refuted this, that just because something is touching the wall and giving support does not mean that its entire length is touching it. It's the same point about the reference to the Brin patent where Mr. Stockwell talked about the first arcuate portion being disposed along the contralateral wall. First of all, that's nowhere in the claims, and even in the specification, just as you can run along the canal without getting wet, you can be disposed along the contralateral wall without touching it over its entire length, and Mr. Horrigan testified to that. With respect to the voicemail, I will note that Mr. Stockwell was very careful to talk about contralateral support and then to say that the voicemail was used but not shown to any outside doctors. So the notion that any of this material actually went to outside doctors is speculative and not based on anything in the record. On the diagram that I keep referring to on 10329, reprinted on page 11 of our document, Dr. Voda testified that that was borderline. That is not true. The page that I at least meant to cite, and which I thought I did cite in my opening argument, was 6893, and on 6893, starting at line 4, Dr. Voda is asked to look at Plaintiff's Exhibit 36, page 5. That's 10329. You agree that if a physician inserted an EBU in this position, it would not infringe your patent? Answer, that is correct. He then goes on and talks about sizing, but the point is that he admits it is correct, that that drawing does not depict an infringement. With respect to the willfulness issue, I think Bard is clear. The issue of objective reasonableness is an issue for the judge to be decided as a matter of law. The judge is in a position to evaluate the reasonableness of the arguments de novo, and I think in a case where there is no allegation of direct infringement by Medtronic, obviously, the only And I think in a case where you have a company that develops its own device independently, with the goal of contacting the aortic wall at an apex, not along a length, deliberately refuses to make its product more like Voda, even though a doctor asked it to, and undisputedly has a product with non-infringing uses, then the judge is well within his rights to determine as a matter of law that there are reasonable defenses to induced infringement. Unless the Court has any further questions, I'm happy to rest Thank you, Mr. Klemmer. Thank you very much.